Approved: s/Christine I. Magdo, by the Court, with permission
         CHRISTINE I. MAGDO / GINA CASTELLANO / ROBERT L. BOONE
         Assistant United States Attorneys

Before:  HONORABLE DEBRA FREEMAN
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :   **20 MAG 9706**
                                  :   <u>SEALED COMPLAINT</u>
UNITED STATES OF AMERICA          :
                                  :   Violations of
         - v. -                   :   15 U.S.C. §§ 78j(b) & 78ff; 17
                                  :   C.F.R. § 240.10b-5; 18 U.S.C.
JEFFREY HASTINGS,                 :   §§ 371, 1343, 1349 & 2.
                                  :
              Defendant.          :   COUNTY OF OFFENSE:
                                  :   NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       FATIMA HAQUE being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

<u>COUNT ONE</u>
**(Conspiracy To Commit Securities Fraud and Make
False Statements In Annual And Quarterly SEC Reports)**

       1.   From at least in or about February 2015 through in or about April 2017, in the Southern District of New York and elsewhere, JEFFREY HASTINGS, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, namely (a) to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (b) making false and misleading statements of material fact in applications, reports, and documents required to be filed with the United States Securities and Exchange Commission ("SEC") under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

### Objects Of The Conspiracy

#### Fraud in Connection with the Purchase and Sale of Securities

2. It was a part and an object of the conspiracy that JEFFREY HASTINGS, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

#### False Statements in Annual and Quarterly SEC Reports

3. It was further a part and an object of the conspiracy that JEFFREY HASTINGS, the defendant, and others known and unknown, willfully and knowingly, would and did make and cause to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13b-13.

#### Overt Acts

4. In furtherance of the conspiracy and to effect its illegal objects, JEFFREY HASTINGS, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about May 13, 2015, a co-conspirator not named herein ("CC-1")[1] sent an email message, via SAEX's email servers located outside the state of New York, to a portfolio manager at a hedge fund located in New York, New York, in which CC-1 falsely stated, "At this point there is an estimated equity infusion into ASV of $7M which should be more than sufficient . . . SAE will not be participating in the equity."

b. On or about January 27, 2016, CC-1 sent an email message, via SAEX's email servers located outside the state of New York, to several employees of a financial institution, located in New York, New York, soliciting that institution's investment in ASV. In the email message, CC-1 falsely stated that CC-1 had "no interest or dealings with" a shell company that CC-1 had helped to create that had transferred more than $5 million to ASV in or about December 2015.

c. On or about March 15, 2016, HASTINGS, in his capacity as Executive Chairman and Director of SAEX, signed SAEX's Form 10-K for 2015, which was disseminated to investors, including investors located in the Southern District of New York, by means of interstate wires, including the internet, which falsely reported 2015 revenue from ASV (referred to as Customer A) of approximately $83.8 million, which accounted for approximately 37% of SAEX's consolidated revenue for 2015.

d. On or about August 12, 2016 and on or about November 4, 2016, in connection with SAEX's filing of its Form 10-Qs for the periods ending on June 30, 2016 and September 30, 2016, respectively, HASTINGS, in his capacity as Chief Executive Officer and Chairman of the Board, signed (i) a "Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002," in which HASTINGS falsely certified that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and (ii) a "Certification Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002"

---

[1] CC-1, who has potential criminal liability for, among other crimes, securities fraud, wire fraud, and conspiracies to commit the same, is not currently charged with any crimes but has agreed to assist law enforcement, in part, in hopes of entering into a cooperation agreement with the Government. CC-1's information has been corroborated by, among other things, electronic communications received from SAEX and others, including electronic communications between CC-1 and HASTINGS.

3

in which HASTINGS falsely certified that the information contained in SAEX's Form 10-Q for the relevant period "fairly presents, in all material respects, the financial condition and results of operations of the company."

   e. On or about March 15, 2017, HASTINGS, in his capacity as Chief Executive Officer and Chairman of the Board, signed SAEX's Form 10-K for 2016, which was disseminated to investors, including investors located in the Southern District of New York, by means of interstate wires, including the internet, which falsely reported 2016 revenue from ASV (referred to as Customer B) of approximately $57.3 million, approximately 28% of SAEX's consolidated revenue for 2016.

   (Title 18, United States Code, Section 371.)

## COUNT TWO
**(Securities Fraud)**

  5. From at least in or about February 2015 through in or about April 2017, in the Southern District of New York and elsewhere, JEFFREY HASTINGS, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to wit, HASTINGS engaged in a scheme to mislead the shareholders of SAEX and the investing public by fraudulently inflating SAEX's reported revenue.

 (Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

6. From at least in or about February 2015 through in or about April 2017, in the Southern District of New York and elsewhere, JEFFREY HASTINGS, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object Of The Conspiracy

7. It was a part and an object of the conspiracy that JEFFREY HASTINGS, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

8. From at least in or about February 2015 through in or about April 2017, in the Southern District of New York and elsewhere, JEFFREY HASTINGS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HASTINGS, and others known and unknown, through the use of interstate wires and false and misleading representations, participated in a scheme to defraud SAEX and its shareholders by misappropriating millions of dollars of SAEX funds.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9. I have been a Special Agent with the FBI for approximately two and a half years. I am currently assigned to a squad that is responsible for investigating violations of the federal securities laws, as well as wire and mail fraud laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for committing such offenses.

10. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including interviews of individuals who worked for SAEX, electronic communications obtained from SAEX, a review of SAEX's filings with the SEC, bank records, and documents provided by others, and from speaking with attorneys and an accountant from the SEC. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Background

### Relevant Individuals and Entities

11. At all times relevant to this Complaint, SAExploration Holdings, Inc. ("SAEX" or the "Company") was a publicly-traded seismic data acquisition company headquarted in Houston, Texas whose stock was traded on the NASDAQ Capital Market under the ticker symbol SAEX.

12. At all times relevant to this Complaint until in or about August 2016, JEFFREY HASTINGS, the defendant, was the Executive Chairman of the Board of Directors of SAEX. At all times relevant to this Complaint after in or about August 2016, until his separation from the Company in or about August 2019, HASTINGS served as both the Chairman of the Board of Directors and the Chief Executive Officer ("CEO") of SAEX.

13. At all times relevant to this Complaint, until his separation from the Company in or about August 2019, CC-1 was the Chief Financial Officer ("CFO") and the General Counsel ("GC") of SAEX.

6

14.  At all times relevant to this Complaint until in or about August 2016, a co-conspirator not named herein ("CC-2") was the founder, President and CEO of SAEX. At all times relevant to this Complaint after in or about August 2016, until his separation from the Company in or about December 2019, CC-2 was the Chief Operating Officer ("COO") of SAEX.

15.  At all times relevant to this Complaint until in or about August 2016, a co-conspirator not named herein ("CC-3," collectively with CC-1 and CC-2, the "Conspirators") was the Executive Vice President for Operations at SAEX. At all times relevant to this Complaint after in or about August 2016, CC-3 was Senior Vice President at SAEX.

16.  At all times relevant to this Complaint, beginning in or about May 2015, Alaskan Seismic Ventures, LLC ("ASV") was a seismic data library company incorporated in Alaska that purchased seismic data from SAEX and licensed that data to third parties, namely oil and gas companies.

17.  At all times relevant to this Complaint, beginning in or about September 2015, Global Equipment Solutions ("Global Equipment") was a company incorporated in Delaware controlled by HASTINGS and CC-1 that purportedly rented seismic acquisition equipment to SAEX.

<u>Relevant Public Company Reporting Requirements</u>

18.  At all times relevant to this Complaint, SAEX was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and disclosed to the public.

19.  Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, SAEX was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K); and (b) file with the SEC quarterly financial reports (on SEC Form 10-Q).

20.  At all times relevant to this Complaint, among the most critical financial metrics disclosed in SAEX's public filings with the SEC were SAEX's quarterly and annual revenue.

**The Schemes to Defraud**

21.  From at least in or about October 2015 through at least in or about August 2019, JEFFREY HASTINGS, the defendant, working with CC-1, and with the knowledge of CC-2 and CC-3, devised and

7

carried out a scheme to defraud SAEX, its shareholders and the investing public by artificially and materially inflating SAEX's reported revenue by making it appear that ASV was a significant source of independent revenue when in fact, and as hidden from investors, ASV was not independent and could not pay SAEX for seismic data.

22. To cover up the scheme, HASTINGS and CC-1, with the knowledge of CC-2 and CC-3, engaged in a scheme to route money belonging to SAEX to ASV in the form of what they termed "fake equity," for the purpose of making lenders believe ASV had more funds than it did; and then, when the lending did not materialize, (b) engaging in what they termed "round-tripping" whereby SAEX funds were routed to ASV and then routed back to SAEX to pay outstanding receivables. At no time was either the "fake equity" or "round-tripping" disclosed to SAEX shareholders or the investing public.

23. In addition, HASTINGS, CC-1, CC-2 and CC-3, misappropriated more than half of the $12 million in SAEX funds intended to be round-tripped to ASV through Global Equipment, for their own personal use. The misappropriation of these funds for the benefit of HASTINGS and the Conspirators was also not disclosed to investors.

### HASTINGS and CC-1 Set Up ASV in Order for SAEX to Take Advantage of Certain Alaska Tax Credits and to Inflate SAEX's Reported Revenue

24. Based on my review of electronic communications exchanged between JEFFREY HASTINGS, the defendant, CC-1, and others, transcripts of depositions conducted by the SEC, documents related to the formation of ASV, as well as my interviews with CC-1 and others, I have learned, among other things, the following:

    a. From at least in or about February 2015, HASTINGS and CC-1 discussed finding a way for SAEX to take advantage of certain tax credits offered by the State of Alaska to, among others, seismic data library companies, to offset the costs of exploring for oil and gas in Alaska (the "Alaska Tax Credits"). In addition to the fact that SAEX was not eligible to apply for the Alaska Tax Credits, the Board of SAEX was opposed to operating its own data library, including because of concerns about the ability to ensure payment to SAEX, including through the monetization of Alaska Tax Credits. To avoid the appearance that SAEX was operating a data library company that licensed to third parties, HASTINGS and CC-1 set up ASV to purport to operate as an independent company purchasing seismic data from SAEX and license

8

it to third parties. HASTINGS recruited an acquaintance to serve as the owner and sole employee of ASV.

  b. In order for ASV to qualify to receive Alaska Tax Credits, ASV's purchase of seismic data from SAEX was required to be an arm's length relationship. It was not, however, and HASTINGS and CC-1 concealed the affiliation between ASV and SAEX, as well as their own involvement with ASV, from SAEX's Board, shareholders and the investing public.

In Early-to-Mid 2015, HASTINGS and CC-1 Transfer Funds
from SAEX through Shell Companies to ASV as
"Fake Equity" to Fraudulently Induce Lenders to Fund ASV

  25. Based on my review of electronic communications exchanged between JEFFREY HASTINGS, the defendant, CC-1, and others, bank records, publicly-available certificates of incorporation and other publicly-available documents, as well as my interviews with CC-1 and others, I have learned, among other things, the following:

  a. In or about May 2015, HASTINGS and CC-1 learned that financial institutions and other lenders (collectively, the "Lenders") were willing to make loans to ASV, if ASV was able to demonstrate that it had substantial capital. HASTINGS and CC-1 wanted the Lenders to lend ASV money so those funds could be used to pay SAEX for seismic data and reported as revenue. As a result, to make ASV look like an independent and financially healthy company, HASTINGS and CC-1 conceived a plan to transfer funds from SAEX to ASV on a temporary basis, to give the Lenders the false impression that ASV had obtained an equity investment.

  b. Because HASTINGS and CC-1 needed to maintain the false appearance that ASV was independent of SAEX, they concealed the transfer of funds from SAEX to ASV by funneling it through a series of shell companies that they created and controlled. For example, on or about May 13, 2015, a portfolio manager (the "Portfolio Manager") at a hedge fund located in New York, New York, sent an email to CC-1 asking how ASV would raise equity: "Where are they [ASV] getting that money from [?] Was SAE raising the equity to cover that?" In response, CC-1 sent an email to the Portfolio Manager falsely stating, "At this point there is an estimated equity infusion into ASV of $7M which should be more than sufficient . . . SAE will not be participating in the equity."

  c. In or about July 2015, HASTINGS and the Conspirators continued to discuss the need for ASV to obtain loans,

9

so that ASV could use the loan proceeds to pay SAEX for its seismic data. HASTINGS and CC-1 informed CC-2 and CC-3 of their plan to secretly transfer funds from SAEX to ASV to assist ASV in securing loans from the Lenders.

       d.    From in or about August 2015 through in or about November 2015, HASTINGS and CC-1 created and caused to be created a number of shell companies (the "Shell Companies") using the names of nominee owners that they had recruited from among their relatives and friends. It was through the Shell Companies that HASTINGS and CC-1 planned to secretly transfer funds from SAEX into ASV, in what would appear to the Lenders to be an equity investment.

       e.    In or about October 2015, HASTINGS and the Conspirators discussed that Lenders would require ASV to show approximately $6 million in equity investments in order for the Lenders to make loans to ASV.

       f.    One of the Shell Companies, Global Equipment, was incorporated by CC-1 on behalf of HASTINGS. Global Equipment was purportedly an equipment rental company from which SAEX rented seismic acquisition equipment. In truth and in fact, and as HASTINGS and the Conspirators well knew, SAEX did not rent any equipment from Global Equipment and did not owe Global Equipment any money. The Conspirators took steps to make the payments from SAEX to Global Equipment appear legitimate to others at SAEX; for example, CC-1 drafted a lease agreement between SAEX and Global Equipment and CC-3 created fake purchase orders, some of which were back-dated, that purported to show expenses incurred by SAEX as a result of renting equipment from Global Equipment. In total, by the end of 2015, SAEX had recorded on its books approximately $12 million in payables to Global Equipment. In or about October and November 2015, HASTINGS and the Conspirators caused SAEX to make payments totaling approximately $6.78 million to Global Equipment, purportedly for rental expenses.

       g.    From in or about October 2015 through in or about December 2015, portions of the $6.78 million received by Global Equipment from SAEX were transferred to the other Shell Companies. In or about December 2015, approximately $5.9 million was transferred, in the guise of an equity investment, from one of the Shell Companies (Company-1) to ASV, in order to induce the Lenders to make loans to ASV.

       h.    On or about January 27, 2016, CC-1 sent an email message to several employees of a financial institution, located in New York, New York, from which CC-1 was soliciting an investment

in ASV. In the email message, CC-1 falsely stated that CC-1 had "no interest or dealings with" Company-1.

### In late 2015, When the Financing Falls through, ASV Engages in "Round-Tripping" By Sending Millions Back to SAEX as Purportedly Legitimate Payments

26. Ultimately, the Lenders decided not to provide funding to ASV in 2015. HASTINGS and CC-1, with the knowledge of CC-2 and CC-3, decided to use a portion of the SAEX funds that had been transferred to ASV through Global Equipment to make it appear that ASV was paying the amounts it owed to SAEX for seismic data. HASTINGS and the Co-Conspirators referred to this portion of the scheme as "Round Tripping." In or about December 2015, ASV transferred approximately $5.8 million to SAEX as partial payment for the seismic data it had acquired from SAEX. The fact that these funds originated with SAEX was not disclosed to investors.

### In 2016, HASTINGS and CC-1 Misappropriate More Than $5 Million from SAEX through Global Equipment

27. Based on my review of electronic communications exchanged between JEFFREY HASTINGS, the defendant, CC-1 and others, and bank records, as well as from interviews with CC-1 and others, I have learned, among other things, the following:

a. In or about January 2016, SAEX's books and records reflected that it still owed more than $5 million in outstanding payables to Global Equipment, as a result of the fraud described in the prior paragraphs. In truth and in fact, these payables were fictitious, as Global Equipment was a shell company designed to route money from SAEX to ASV. From in or about September 2016 through in or about December 2016, HASTINGS and the Conspirators caused SAEX to make payments totaling more than $5 million to Global Equipment for equipment rentals that they knew had, in fact, never occurred. SAEX had to restructure its debt holdings in order to be able to afford to make the fictitious payments.

b. From in or about September 2016 through in or about April 2017, HASTINGS and CC-1 misappropriated more than $5 million for their own use, by transferring the funds into bank accounts that they controlled. In setting up one such account, on or about June 23, 2016, CC-1 sent an email message, via SAEX's email servers located outside the state of New York, to an employee of a financial institution located in New York, New York, in which CC-1 provided information requested by the financial institution. HASTINGS and CC-1 used a portion of the more than $5 million that

11

they misappropriated from SAEX to make payments to CC-2 and CC-3, among others.

### HASTINGS and Others Make and Cause to Be Made False Statements in SAEX Filings with the SEC

28. Based on my review of SAEX filings with the SEC, as well as from interviews with CC-1 and others, I have learned, among other things, the following:

    a. HASTINGS failed to disclose his and CC-1's control and ownership of Global Equipment.

    b. HASTINGS failed to disclose that SAEX had never rented any equipment from Global Equipment and that SAEX never owned any payments for rental expenses to Global Equipment.

    c. HASTINGS failed to disclose that there was no legitimate business purpose for SAEX to make approximately $12 million in payments to Global Equipment.

    d. HASTINGS failed to disclose that, of the approximately $12 million in payments that SAEX made to Global Equipment, more than $5 million was funneled through the Shell Companies to ASV.

    e. HASTINGS failed to disclose that SAEX had a controlling financial interest in ASV and that SAEX was the primary beneficiary of ASV.

    f. HASTINGS failed to disclose his and CC-1's control and ownership of the Shell Companies.

    g. HASTINGS failed to disclose that more than $5 million that ASV paid SAEX consisted of funds that they had misappropriated from SAEX and did not constitute legitimate revenue to SAEX.

    h. HASTINGS failed to disclose that, of the approximately $12 million in payments that SAEX made to Global Equipment, more than $6 million was misappropriated by HASTINGS and CC-1 and distributed to HASTINGS, the Conspirators and others.

### HASTINGS Invents a Cover Story for the Conspirators

29. Based on my review of electronic communications among JEFFREY HASTINGS, the defendant, and the Conspirators, travel records, information provided by the SEC and SAEX, I have learned, among other things, the following:

      a. In or about August 2019, HASTINGS and the Conspirators met at a hotel in Toronto, Canada to discuss an investigation being conducted by SAEX's outside counsel ("Outside Counsel") into the conduct described in this Complaint. HASTINGS and the Conspirators discussed what they would tell Outside Counsel about the $12 million that SAEX had paid to Global Equipment. HASTINGS proposed a cover story, according to which the payments to Global Equipment would be described as compensation that SAEX was obligated to pay HASTINGS as consideration for his assignment of a contract to SAEX in 2011 (the "Assignment"). In truth and in fact, and as the Conspirators well knew, HASTINGS was not due to receive any compensation from SAEX for the Assignment.

    WHEREFORE, I respectfully request that an arrest warrant be issued for JEFFREY HASTINGS, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

                                                          *s/Fatima Haque, by the Court, with permission*
                                                          FATIMA HAQUE
                                                          SPECIAL AGENT
                                                          FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
__11th__ day of September, 2020  *by reliable electronic means (FaceTime)*

_____
HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK